HENRY COX AND BETTIE COX, RESPONDENTS, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, APPELLANT.*

Springfield Court of Appeals. May 24, 1928.

*Corpus Juris-Cyc References: Evidence, 23CJ, section 1797, p. 56, n. 24; Motor Vehicles, 42CJ, section 956, p. 1178, n. 5; section 1046, p. 1238, n. 49; Negligence, 45CJ, section 540, p. 989, n. 8; section 760, p. 1184, n. 27; section 875, p. 1316, n. 8; Railroads, 33Cyc, p. 1017, n. 72, 73.

*E. T. Miller* and *Ward & Reeves* for appellant.

*Smith & Zimmerman* for respondents.

BRADLEY, J.—Plaintiffs sued to recover for the death of their minor daughter, Cinda Cox, aged nineteen years, killed on a crossing in the city of Clarkton in Dunklin county on January 25, 1926. The petition charged that defendant was negligent (1) by backing its

train over the crossing at fifteen miles an hour in violation of a speed ordinance limiting the speed of trains in the city limits to five miles per hour; (2) by backing its train at a high and dangerous rate of speed over the crossing obscured from view in approaching from the north; and (3) by a violation of the humanitarian rule. The answer was a general denial and a plea of contributory negligence. The reply was a general denial. Plaintiffs submitted their cause to the jury on the alleged violation of the speed ordinance and on the humanitarian doctrine.

Error is assigned on the refusal of general and special demurrers to the evidence at the close of the case, on the instructions and on the admission of evidence.

Two questions on the demurrers are presented, viz.: (1) Was deceased as a matter of law guilty of contributory negligence? and (2) under the facts may the humanitarian doctrine be invoked? Defendant's passenger train consisting of engine, tender and two coaches arrived at Clarkton from the east late in the afternoon. About 900 feet west of the depot the train turned north about seven miles to Malden. It backed from Malden back to Clarkton and then headed west to Gibson. The crossing where deceased was killed is about 300 feet west of the depot and about 600 feet east of the wye where the train turned north to Malden. Deceased was killed as the train was backing over the crossing on the return from Malden about 5:40 p. m.

It is conceded- that defendant's train was exceeding the speed prescribed by the city ordinance, hence in disposing of plaintiffs' right to go to the jury on the alleged negligence in violating the speed ordinance, the only question is the alleged contributory negligence of deceased. Highway No. 25 runs north and south through Clarkton and crosses defendant's tracks in the south part of the town and this highway is the main street. In approaching the crossing from the north, buildings on the west side of the street obstruct the traveler's view to the west until within twenty-one feet of the north rail. Owen James, aged eighteen or nineteen, Blanche Irwin, aged twenty, and deceased, aged nineteen, were riding in a Ford sedan driven by James. Deceased had lived with her parents in Clarkton for eight years; Blanche Irwin had lived in Clarkton practically all her life and Owen James had lived there for quite a length of time. Deceased and Blanche Irwin had been together the greater part of the day and deceased was intending to spend the night with Blanche Irwin. Deceased lived in the northwest part of town. James was to drive them to the home of deceased. A short time before the collision deceased and Blanche Irwin got in the car with James and drove to Blanche's home. After leaving Blanche's home they did not drive to the home of deceased, but drove to highway No. 25, the main street of the

town, and thence south towards the crossing. James sat on the left and was driving, deceased sat in the middle and Blanche on the right. In approaching the crossing James drove for some distance immediately behind C. P. Fisher who turned in towards the curb and stopped his car in front of or a short distance south of the entrance to a restaurant on the west side of the street. Fisher's car stopped twelve or fifteen feet north of the corner of the building which was twenty-one feet north of the north rail.

The train was due back from Malden about 5:40 p. m. and was on time. Such had been the schedule for a long time. The train, backing, approached the crossing from the west at about twelve miles per hour. The automobile approached at about fifteen miles per hour. The speed of the train was estimated all the way from ten to fifteen miles and the speed of the automobile was estimated as high as twenty miles per hour. It was not dark, but about dusk as all agree. The train had a light on the rear which was visible all the way from a quarter to a half mile. The conductor stood on the rear platform and sounded the air whistle at frequent intervals from the wye 600 feet west of the crossing. Also the steam whistle on the engine was blown at frequent intervals, and the fireman testified that the bell was ringing all the way from the wye until the collision.

The width of Main street or highway No. 25 is thirty-eight feet. James' car when it turned around Fisher's was at least thirty-three feet from the crossing, but at that point he and the other occupants would not have had any view west up the track except what the range of vision would have covered, but when the car reached the corner of the building, twenty-one feet north of the north rail, the view was unobstructed. If the train was moving twelve miles per hour it was moving seventeen and five-tenths feet per second. If the automobile was moving fifteen miles per hour it was moving twenty and seven-eighth feet per second. The collision occurred about the middle of the crossing; that, is, nineteen feet east of the sidewalk on the west side of the street. The automobile was struck about its middle or slightly towards its rear from the middle. On the basis of twelve miles for the train and fifteen miles for the automobile the train must have already entered the crossing when that part or portion of the automobile where the occupants were seated reached the corner of the building twenty-one feet north of the north rail. If the automobile was going eighteen miles and the train twelve and the collision was in the center of the crossing, then the automobile was thirty feet north of the point of collision when the train entered the crossing. If the train was running fifteen miles and the automobile twelve and the automobile was struck about its middle, then while the train moved twenty feet from the west side of the crossing to the point of collision the automobile moved sixteen feet. On this

basis the occupants of the automobile were beyond the corner of the building before the train entered the crossing. The automobile when it turned around Fisher's car went nearer to the center of the street. Since it was struck at or near the center of the crossing and since there is no evidence that it made any turn to the east after passing Fisher's car it is fair to assume that the automobile approached the crossing traveling near the center of the street. Such being the case the automobile was about nineteen feet east of the building which was twenty-one feet north of the north rail, therefore, there was some range of vision west from the west line of the crossing before the occupants passed the corner of the building.

On any theory or basis deduced from the situation and the estimated speeds of the train and the automobile and allowing anything for the range of vision there is no escape from the conclusion that the occupants drove at least twenty-five or thirty feet towards the crossing and to the point of collision when the train was in plain view with light burning. And this does not take into account the air whistle, the steam whistle and the noise of the train, all of which were heard by everybody except the occupants of the automobile.

It is conceded that deceased was in the automobile as a guest of James who was also killed in the collision. Being the guest of the driver his negligence cannot be imputed to deceased. There is no controversy about such being the law. The concrete question, therefore, is: Was deceased as a guest guilty of contributory negligence as a matter of law? Blanche Irwin survived the collision and was a witness for plaintiffs. She related how she and deceased became guests of James on the fatal ride; that she did not see any headlight nor hear any noise of the train as the automobile turned around Fisher's car; that she and deceased were not talking to the driver as they approached the track; that she did not see the train until they were on the track: "It was just right on us when I saw it;" that she just got one glance of the train before it struck; that she was looking when they passed the corner of the building, but did not see the train until they got on the track; that there was nothing to obstruct the view after passing the corner of the building.

"As we approached this crossing we were talking, making plans for what we were going to do that night. Owen wasn't saying anything; but Cinda and I were talking about dates, one thing. We were talking about a man we hadn't met, and she wanted me to be with him, and I told her I didn't know him, and she says, 'Well, you can meet him' and says 'I'll be with you,' so that I could meet this man, and Owen was going to be with us too."

Witness at first stated that the conversation just quoted was finished about the time the automobile was even with the restaurant which was at about the place where Fishers car stopped which was

at least thirty-three feet from the north rail. But when shown her testimony at a former trial of this cause she stated:

"This conversation that we had about the dates lasted until the front wheels of our car got to the first rail of the railroad track at the crossing where the accident happened; while we were having that talk, I didn't notice whether Owen ever looked up towards the train or not, and I don't know whether Cinda ever looked towards the train or not. There was nothing said by me or either of them about the oncoming train. Nothing was said about it being train time, and nothing was said by me or either of them about stopping here before we started across this track."

A guest or passenger in an automobile about to cross a railroad track is not required to use the same vigilance as is required of the driver, but is required to use that degree of care that an ordinarily prudent person would use under similar circumstances. [Durbin v. Railroad, 275 S. W. (Mo. App.) 358.]

We think that the law respecting the care of a guest in a vehicle is well and correctly stated in Burton v. Pryor, 198 S. W. (Mo. App.) 1117. There the court said:

"Although plaintiff was in the buggy as a guest or by favor, yet he was still called upon to exercise all the care which ordinary caution required of him under the circumstances. If in the exercise of common prudence he knew or should have known of the danger and that the driver was apparently taking no cognizance of it, or was taking no precautions in regard thereto, it was plaintiff's duty to warn him, or call his attention to it in some way. He could not negligently abandon the exercise of his own faculties and, without taking any precautions of his own or making any effort whatever, resign himself absolutely to the driver's care regardless of the visible lack of ordinary caution on the latter's part, and relieve himself of the consequences of his own negligence by hiding behind the fact that the other man was driving. [Schults v. Old Colony Street Railway, 193 Mass. 309, 323, 79 N. E. 873, 8 L. R. S. (N. S.) 597, 118 Am. St. Rep. 502, 9 Ann. Cas. 402.]"

In Chapman v. Railroad, 217 Mo. App. 312, 269 S. W. 688, we quoted with approval the above excerpt from Burton v. Pryor. According to the evidence of Blanche Irwin and from other facts and circumstances the reasonable conclusion cannot be escaped that these three young people drove upon the railroad track without any thought of track, train or danger. Deceased was sitting in the middle. She and Blanche Irwin were talking about a date. If she turned her face toward Blanche while carrying on the conversation her vision was towards the oncoming train. If she was looking straight ahead there was the track, a warning of danger, staring her in the face. There was also the headlight which was plainly visible,

and also there was the word "stop" in big letters on a board attached to a post; said sign being placed by direction of a city ordinance requiring all motor vehicles to come to a complete.stop before proceeding over this crossing. In addition to all of these the air whistle and the steam whistle were sounding, and there was the noise of a running train. Yet and yet, neither occupant saw nor heard because he nor she did not look and did not listen. As we understand the record there was no driveway east or west along the north side of the track, but there was at least nineteen feet of the open highway or street east and west of the automobile and the evidence showed that the automobile could have been turned and driven east, although there was no roadway.

A word of warning to the unfortunate youth at the wheel would have rescued him from his evident lapse of vigilance and permitted him to stop or turn to the east and this unfortunate casualty would have been averted. But this warning he did not receive from either of his guests whose duty it was to warn him if they knew or should have known of the danger and knew or should have known that he, the driver, "was taking no cognizance of it." [Burton v. Pryor, supra.]

Learned counsel for plaintiffs earnestly urge that Boland v. Railroad, 284 S. W. (Mo. Sup.) 141, supports their contention that deceased, Cinda Cox, was not, as a matter of law guilty of contributory negligence. In that case the facts as appear in the reported opinion are as follows: The railroad consisted of a double track and ran east and west through the town of Eureka in St. Louis county. The north track was used for westbound trains and the south track for eastbound trains. Immediately north of the right-of-way was the public road which also ran east and west. A half mile west of Eureka was the Magazine crossing leading south to the Magazine farm, a place for recreation. The two railroad tracks at the Magazine crossing were nine feet apart. November 11, 1922, a dinner was to be given on the Magazine farm to the local members of the American Legion. The food had been donated by the citizens of Eureka and a number of women had volunteered to prepare and serve it. One Hance, a business man of the town, as his contribution to the event, undertook to convey to the farm the women who were going in advance to prepare the dinner. Pursuant to that arrangement he took his touring car, gathered up four women and started to the farm at about 9:20 A. M. One of his passengers was the plaintiff who was then a high school girl seventeen years of age. She sat at Hance's right on the front seat; the three others sat in the back seat. When the automobile arrived at Magazine crossing it was obstructed by a westbound freight train standing on the north track. The freight train consisted of thirty or more cars and the greater portion of the

freight train was west of the crossing. Hance brought his automobile to a stop within twelve or fifteen feet of the standing train. In three or four minutes the freight train began moving west and as soon as it had cleared the crossing Hance put his car in motion and started across at the rate of three or four miles per hour. When the front part of his car passed onto the south track, the front wheels being between the rails, it was struck by an east bound passenger train running thirty-five or forty miles an hour. Hance and Miss Boland were seriously injured and the three women in the back seat were killed.

From the Magazine crossing the railroad was straight and visible both east and west for quite a distance. Hance testified that before he started his car to go over the crossing he looked both east and west, but saw no train approaching. He admitted that his view to the west was completely obstructed by the slowly moving freight train. He never at any time saw the approaching passenger train. He recalled that there was a crash and that was all. Miss Boland did not remember anything about it. Both Hance and Miss Boland were perfectly familiar with the crossing and the use made of the double tracks, and they both knew that the passenger train which struck them was due to arrive at Eureka at 9:35. As they approached the crossing and while waiting for the freight train to clear, the women in the car were talking, but nothing was said about the passenger train; nor was there any suggestion on the part of Miss Boland or any of the others as to the advisability of waiting until the freight train moved a sufficient distance to enable them to see whether a train was approaching on the south track from the west. No word of caution was uttered by anyone. According to plaintiff's evidence in the Boland case no signal by bell or whistle was given by the passenger train as it approached the crossing, and at the time it was coasting and not working the steam and there was no noise of the exhaust. A brakeman was on the rear end of the rear car of the freight train and as it passed over the crossing he observed that Hance was preparing to start. The brakeman hallooed and motioned in an effort to warn the occupants of the automobile of the approach of the passenger train, but he was unable to attract attention. The brakeman testified that Hance and Miss Boland were looking straight ahead and continued to so look until struck.

Under the facts stated the Supreme Court held that the question of Miss Boland's negligence was for the jury, but stated the law to be:

"We fully subscribe to the doctrine that the occupant of a vehicle cannot abandon the exercise of his own faculties and intrust his safety absolutely to the driver, regardless of the imminence of danger

or the visible lack of ordinary caution on the part of the driver to avoid harm.''

And the court in the Boland case further said: ''It is reasonably clear from the evidence that however attentively plaintiff might have looked or listened she would not have discovered the approaching train until the part of the automobile in which she was seated had passed over the south rail of the north track. If she had then looked it is far from certain that she could have understandingly conveyed to the driver the information that a train was coming in time to have enabled him to bring the automobile to a stop before it reached the zone of danger.''

The statement just quoted we think clearly distinguishes the facts in the Boland case from the facts of the cause at bar. There it did not reasonably appear that had Miss Boland been vigilant she could have discovered the approaching train in time to have given an effective warning before the automobile reached the danger zone. The same cannot, in justice and good reason, be said of Cinda Cox in the cause at bar. Another distinguishing feature between the facts at bar and the facts in the Boland case is that in the cause at bar warning was given by air whistle and steam whistle of the approach of the train and its light on the rear was burning. To hold that Cinda Cox was not guilty of contributory negligence as a matter of law, in failing to warn the driver of the approach of the train would be to hold that an automobile guest nineteen years of age and in possession of all his or her faculties and sitting by the driver and not diverted by anything reasonably requiring attention, can completely entrust his or her safety at a railroad crossing to the driver of the automobile and without exercising any care for his or her own safety make the question of his or her negligence one for the jury. Such holding would be contrary to the law as we understand it. [Durbin v. Railroad, 275 S. W. (Mo. App.) 1. c. 360; Chapman v. Railroad, 269 S. W. (Mo. App.) 688; Allen v. Railroad, 281 S. W. (Mo. Sup.) 737; Nahorski v. Railroad, 310 Mo. 227, 274 S. W. 1025; Friedman v. Railroad, 293 Mo. 1. c. 243, 238 S. W. 1024; Lawrence v. Railroad, 258 S. W. (Mo. App.) 1. c. 56; Sorrell v. Railroad, 247 S. W. . (Mo. App.) 462.] We hold that deceased was guilty of contributory negligence as a matter of law.

May the humanitarian doctrine be invoked? This doctrine or theory of negligence attaches no importance to the question of whose fault created or contributed to the creation of the peril that ripened into injury. [Moffatt v. Link, 207 Mo. App. 654, 229 S. W. 836; Alexander v. Railroad, —— S. W. (Mo. App.) ——. The evidence as to conditions, etc., was about as follows: E. J. Harrell, the conductor, was standing on the platform of the rear coach and had charge of the air whistle. The conductor testified that he first saw the

automobile when it was eighteen or twenty feet from the crossing and that he was at that time eighteen or twenty feet from the automobile; that when he first saw the automobile he left the air whistle open, caught the emergency valve and applied the air; that the train consisted of a sixty ton engine, a baggage car and a coach; that it had been snowing that day and that the rails were slick; that there was a slight down grade from the crossing east towards the depot; that the air and brakes were in good condition. There was evidence, however, that the rails were not wet.

L. C. Beasley, assistant superintendent of defendant's river division, was standing on the rear platform behind the conductor and testified that he first saw the automobile when it was about twenty-five feet from the crossing; that it was approaching at fifteen or eighteen miles an hour; that at that time the rear end of the coach was within fifteen or twenty feet of the center of the crossing; that he estimated that the automobile was considerably "further away" than we were and that he was also coming a good deal faster;" that the conductor left the whistle on and grabbed the air valve and pulled it "and by the time he had that done the cars had come together."

C. E. Ormsby engineer on the train, testified that as he approached the crossing he was looking towards it; that he was running ten or twelve miles an hour; that he first saw the automobile when it was eighteen or twenty feet from the crossing and that he, as soon as possible, applied the air and shut off the steam; that it would take a second to turn loose the whistle and apply the air and another second for the brake to take hold.

When the train stopped the rear end of the rear coach was, according to plaintiff's evidence, 108 feet east of the center of the crossing. Between the crossing and the depot to the east there were a frog and a guardrail. The west end of the guardrail was ninety-three feet east of the center of the crossing. When the automobile was hit it was pushed along the track from the point of collision to the guardrail where it was crushed down and under the rear of the rear coach. According to plaintiffs' evidence the train did not come to a stop until the rear of the coach was fifteen feet east of the west end of the guardrail or 108 feet from the point of collision. Plaintiffs offered evidence, the competency of which was challenged, and the competency of which we do not determine, tending to show that this particular train running about twelve miles per hour could be stopped within sixty feet. Counsel base their argument in support of their contention that the humanitarian doctrine may be invoked, on the theory that Cinda Cox was not fatally injured until the automobile was crushed down at the guardrail and on the theory that the train should have been stopped in sixty or eighty feet.

It was not definitely known who applied the air. The conductor testified that he did and the engineer testified that he did. Both could have, hence it is not important who actually applied the air. It was applied and the steam was cut off. It is reasonable to conclude that the engineer and conductor acted about the same time. The engineer testified that it would require about two seconds to apply the air and for it to take hold. The train was running about seventeen and five-tenth feet per second. It would have, therefore, run thirty-five feet before the braking power became effective. Hence the automobile must have been struck before the air became effective. Counsel for plaintiffs take eighteen or twenty feet as the distance which the train was from the point of collision when the conductor first saw the automobile. It was ninety-three feet from the point of collision to the guardrail or 113 feet from the point where the conductor first saw the automobile to the guardrail and seventy-eight feet from the point where the air became effective to the guardrail. Those in charge of the train testified that the moment they saw the automobile they did all in their power to stop. Counsel do not contend that defendant's agents by the exercise of ordinary care should have sooner discovered the peril of the occupants of the automobile. but base their argument of the theory that the train should have been stopped short of the 113 feet after the occupants were seen.

J. P. Longgrear, a witness for plaintiffs, testified that he resided at Clarkton and had been a traveling salesman for ten years; that he worked from October to April one time for defendant as hostler at Hayti, Mo.; that as hostler he had moved engines about to different parts of the yard; that the air would take hold immediately; that he saw the wreck in which Cinda Cox was killed and saw the engine and the train.

"Q. Now, then, can you tell from your experience as a hostler within what distance a train, that engine and two cars, should stop in backing into Clarkton, running say twelve miles an hour?

"Mr. Ward: We object to that for the reason it is a hypothetical question and doesn't incorporate in it all the elements of this lawsuit; it doesn't show the size of the engine and weight, and the condition of the engine or condition of the track, and doesn't show the makeup of this engine and train in question, and also because it calls for an expert opinion, and this witness hasn't qualified to give it. (Objection overruled; defendant excepts.) A. Yes, sir, within less than two rail lengths; I don't know the exact feet, but I'm saying under sixty feet would be less than two rail lengths; I'm considering rails about thirty feet each."

Verne Walker, city marshall and a witness for plaintiffs, testified that at the time of the collision he was about 175 feet north of the

crossing and saw the collision; that the impact broke the two rear wheels down; that he ran angling towards the point where the train stopped; that the rear axle "was sliding on the north rail;" that the rear axle struck the guardrail and raised the coach up a foot or foot and a half and that when it did that the housing broke and just mashed the automobile up under the back end of the coach; that the automobile up to its engine "was ground all to pieces," but from its engine forward the automobile was not "practically hurt." Witness further testified that he had been to the depot "lots of times" and observed this particular train start and stop. Then as to the evidence of this witness the record shows the following:

"Q. You may tell the jury if you observed this particular train, two coaches and this engine, if you observed the distance in which it stopped while coming in there at Clarkton and going out, both ways there, or backing in while coming in; if you ever observed how quick it could stop while running within—say twelve miles an hour?

"Mr. Ward: We object to that because he is not qualified as an expert, and further, it is not shown that he knew what you would have to do before you attempt to stop a train, the action necessary in order to stop a train, and it is not shown that when he saw the train stopped that he knew when they began trying to stop it, or what they did to stop it, and it is merely a conclusion on the part of the witness. (Objection overruled; defendant excepts.) A. It ought to stop in two car lengths of itself; I've saw it do it; I believe, about sixty feet. I said in two car lengths or sixty feet, box car lengths, they run from thirty-six to forty feet. I don't know what their passenger coaches measure. I never measured one of them, but I've measured box cars."

Henry Cox, father of deceased, regarding the stopping of the train, testified that he was working for defendant on the section and that he worked in and around the yards at Clarkton; that he had noticed this particular train stopping as it would back in to Clarkton.

"Q. Well, can you tell, have you observed trains sufficiently to tell how fast a train is going by observing its movement, and about the rate of speed it is making? A. Yes, sir, I believe I have.

"Q. I'll ask you if you have ever observed that particular train pulling into Clarkton at, say a rate of twelve miles an hour, did you ever observe the distance in which it would stop?

"Mr. Ward: We object to that because it is a hypothetical question not based upon the facts in this case, and doesn't take into consideration the condition of things in this particular case, and this man hasn't qualified as an expert and doesn't show that he knew what was done or when it was done or how it is done in order to

stop a train. (Objection overruled; defendant excepts.) A. I've seen it stop awful quick, that is, I have seen it stop shortly, but just exactly what it was making would just be my judgment on that.

"Q. Well, in your judgment, in what distance did you ever see it stop, running that little?

"Mr. Ward: We object to that because it is not shown that the witness knows when they began to stop it, or what operation they did to stop it. (Objection overruled; defendant excepts.) A. I judge something like a rail and a half or two rails. A rail is thirty feet long."

It will be observed that the question asked witness Walker referred to the stopping of the train "while backing in and while coming in." The answer, if reponsive, was that the train ought to have been stopped in sixty feet, at twelve miles an hour, whether backing in or coming in. But what is meant by "coming in" does not appear. Also it is apparent that when he saw the train stopped in his estimate of sixty feet that he had no knowledge of when the stopping appliances were applied or how long they were applied before the train was stopped in sixty feet after he began to observe. If he meant that he had seen this particular train with the same or similar weight engine under similar conditions and while backing in at twelve miles an hour stop in sixty feet from the point where the effort to stop began, he did not say so. At most the evidence of witness Walker as to the stopping of this particular train is no more than a vague and shadowy guess. As to the witnesses Cox and Longgrear the situation is no better.

Conductor Harrell, defendant's witness, on cross-examination testified on the question of stopping as follows:

"Q. I'll ask you to state to the jury in what time you could stop that train running ten or twelve miles an hour with equipment like you had in there? A. A man ought to have—100 feet ain't very far; seventy-five or eighty, something like that; 100 feet ain't very far when you go to stop a train. The way we estimated, we stopped in ninety feet; that's an estimation. It couldn't have been stopped any quicker than that, with safety to anybody. The distance we stopped it, that is the best it could be stopped."

The conductor's positive statement was that the train could not have been stopped with safety to anybody any quicker that it was stopped. He knew whether he did everything possible to stop after he saw the automobile, and as stated there is no evidence that after it was seeable that he should have seen it sooner, hence we are of the opinion that we would be weighing justice lightly to hold that the evidence of the conductor constitutes substantial evidence that the train could have been stopped any quicker than it was stopped.

But if it be conceded that there was substantial evidence tending to show that this train under the conditions should have been stopped in from sixty feet to eighty feet from the point where the effort to stop was or should have commenced, then it would still have to appear that such stopping would have been in time to have saved the life of Cinda Cox, the deceased. [Sullivan v. Railroad, 308 Mo. 48, 271 S. W. 983.] All there is in the record as to whether or not deceased was not fatally injured until the automobile was crushed down at the guardrail is from the evidence of Blanche Irwin and Verne Walker. Blanche Irwin testified:

"I don't know what happened to the car after the train struck the car, but I grabbed something; I don't know what I grabbed at the time, but I hung on to the train, I thought it was, I didn't know, but I knew it was something, and I thought she was hanging on too, and I told her to hang on till it stopped, and she said her feet was hung."

Verne Walker on the question testified: "Q. As this train pushed that car up the track the distance you have described, were those young people living or dead? A. They were living. Yes, sir, you could hear them hollering in there, all of them." Such is the sum total of the evidence on the point. Deceased, Cinda Cox, lived for thirty or forty minutes after she was taken from the wreck and of course she was living as the automobile was being pushed along the track. It would be mere speculation to assume that deceased was not fatally injured until the crush down at the guardrail. Where the automobile was when deceased said her feet were hung does not appear, but the automobile, at that time, was somewhere between the point of collision and the guardrail. But how her feet were hung, what on, the consequences thereof, are all within the realm of speculation. Unfortunately these were matters beyond the scope of possible evidence, but merely because such is the case does not warrant a court or jury in supplementing the facts with speculation, and draw therefrom an inference supposed to be supported by substantial evidence. Courts are supposed to administer justice and we believe that we would not be doing justice if we held that there was under the facts presented, a case made for the jury under the humanitarian doctrine. [Sullivan v. Railroad, 297 S. W. (Mo. Sup.) 945; Grief v. Lead Co., 274 S. W. (Mo. App.) 83; Pedago v. Railroad, 272 S. W. (Mo. App.) 1029; Sorrell v. Railroad, 247 S. W. (Mo. App.) 462; Freie v. Railroad, 241 S. W. (Mo. App.) 671; Roseman v. Railroad, 251 S. W. (Mo. App.) 104.]

Having reached the conclusion that plaintiff cannot recover it is not necessary to consider other assignments. The judgment should be reversed and it is so ordered. *Cox, P. J.,* and *Bailey, J.,* concur.